Michael R. Lozeau (CA Bar No. 142893)
    e-mail:  michael@lozeaudrury.com
Kylah M. Staley (CA Bar No. 347756)
    e-mail:  kylah@lozeaudrury.com
LOZEAU DRURY LLP
1939 Harrison St., Suite 150
Oakland, CA 94612
Tel:  (510) 836-4200
Fax: (510) 836-4205

Attorneys for Plaintiff

UNITED STATE DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| LABORERS INTERNATIONAL UNION OF NORTH AMERICA, LOCAL UNION 1184, a non-profit labor union,<br><br>　　　　　　Plaintiff,<br>　　vs.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, a federal department; BUREAU OF LAND MANAGEMENT, a federal agency; WILLIAM MACK, in his official capacity; STEVEN FELDGUS, in his official capacity; JOVE SOLAR, LLC, a Delaware limited liability company;<br><br>　　　　　　Defendants. | Case No. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1. This is an action brought pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, challenging the decision by Defendants the United States Department of the Interior ("DOI") and the Bureau of Land Management ("BLM") and its Colorado River District, Yuma Field Office and the accompanying final environmental impact statement ("FEIS") and Record of Decision ("ROD") evaluating and approving the awarding of a federal right-of-way grant under the Federal Land Policy Management Act ("FLPMA") 43 U.S.C. §§ 1701 *et seq* to Jove Solar, LCC to construct, operate, maintain, and decommission a utility-scale solar photovoltaic facility on 3,495 acres of BLM-

Complaint - 1

administered public lands in La Paz County, Arizona entitled the Jove Solar Project (hereinafter the "Project"). The Project would generate 600 megawatts and include up to 1.2 million solar PV modules and associated infrastructure, including new and improved roads, powerlines for collection and transmission of energy, and operation and maintenance facilities. The Project would connect to the Ten West Link 500 kV transmission line, which is currently being constructed, via a 69 kilovolt (kV) generation transmission line that would extend from the Project substation for approximately 1.7 miles within a utility easement crossing La Paz County and state land to the Cielo Azul substation, adjacent to the Ten West Link transmission line.

2. Plaintiff Laborers International Union of North America, Local Union 1184 ("LIUNA 1184" or "Plaintiff") brings this action to rectify unlawful deficiencies and errors in the FEIS prepared by the BLM for the Project. In particular, LIUNA 1184 objects to the assessment of the baseline conditions at the Project site, which the FEIS characterizes as "mostly bare ground" and "desert pavement." Expert evidence in the record demonstrates that the Project site is covered by grasses, flowering plants, shrubs, cacti, and trees. The only evidence of "desert pavement" at the site relied on by the FEIS were two photos of desert pavement from an area not included within the Project site.

3. The FEIS states that the Project area does not provide burrowing or sheltering opportunities for the BLM-sensitive species, the Sonoran Desert Tortoise. However, an expert wildlife ecologist identified multiple tortoise burrows on-site. The Project's biologists only conducted a transect survey for the Sonoran Desert Tortoise in an area outside of the Project site. The FEIS summarily rejects expert evidence regarding the mischaracterization of the Project site's baseline conditions, including the detection of Sonoran Desert tortoise burrows, stating that the biological surveys conducted were sufficient to inform the Project's impact analysis. As a result, BLM abused its discretion by concluding that the biological surveys conducted to assess the Project site's baseline conditions were adequate and failing to address relevant, contrary expert evidence.

4. The FEIS' analysis of cumulative impacts to biological resources arbitrarily relies on a 10-mile radius as the limit for the analysis of cumulative effects to biological resources. The FEIS

Complaint - 2

provides no justification for why the BLM chose to restrict geographic scope of the Project's cumulative effects analysis to a 10-mile radius despite expert evidence in the record indicating that such a restriction is not large enough to account for cumulative impacts to desert wildlife. As a result, the BLM's failure to justify the geographic scope of the cumulative effects analysis in the FEIS was arbitrary and capricious.

5. LIUNA 1184 seeks an order vacating and remanding the Final Environmental Impact Statement and the Record of Decision for the Jove Solar Project involving a right-of-way grant issued to Jove Solar, LLC, and order the BLM to prepare a new environmental impact statement addressing all of the above shortcomings and reconsider its ROD based on the new environmental impact statement.

**JURISDICTION AND VENUE**

6. Jurisdiction over this action is conferred by 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (United States as defendant), 28 U.S.C. § 2201 (declaratory relief), and 28 U.S.C. § 2202 (injunctive relief) and the Administrative Procedures Act, 5 U.S.C. §§ 701-706. This Court has jurisdiction under 28 U.S.C. § 1331 because this action involves an agency of the United States as a defendant, and arises under the laws of the United States, including NEPA, 42 U.S.C. 4331 *et. seq.*, and the Administrative Procedure Act, 5 U.S.C. § 500 *et. seq.* The DOI's issuance of the ROD approving the FEIS and the Project constitutes a final agency action. 43 C.F.R. § 4.410(a)(3). There exists an actual controversy between the parties within the meaning of 28 U.S.C. § 2201 (declaratory judgments).

7. Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(e).

8. This complaint is timely filed within the applicable statute of limitations.

**PARTIES**

A. **Plaintiff.**

9. Plaintiff Laborers International Union of North America, Local Union 1184 is a non-profit laborers' union with members living, working, and recreating in Southern California (Riverside and Imperial Counties) and Arizona. LIUNA 1184 maintains an office in Phoenix, Arizona. LIUNA 1184

has more than 600 members living in La Paz, Maricopa, and Yuma Counties in Arizona. LIUNA 1184's purposes include advocating on behalf of its members to ensure safe workplace environments; working to protect recreational opportunities for its members to improve its members' quality of life when off the job; advocating to assure its members access to safe, healthful, productive, and aesthetically and culturally pleasing surroundings on and off the job; promoting environmentally sustainable businesses and development projects on behalf of its members, including providing comments raising environmental concerns and benefits on proposed development projects; advocating for changes to proposed development projects that will help to achieve a balance between employment, the human population, and resource use to permit high standards of living and a wide sharing of life's amenities by its members as well as the general public; advocating for steps to preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment that supports diversity and variety of individual choice; advocating on behalf of its members for programs, policies, and development projects that promote not only good jobs but also a healthy natural environment and working environment, including advocating for changes to proposed projects and policies that, if adopted, would reduce air, soil, and water pollution, minimize harm to wildlife, conserve wild places, reduce traffic congestion, reduce global warming impacts, and assure compliance with applicable land use ordinances; and working to attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable or unintended consequences.

   10. Members of LIUNA 1184 live, work, and recreate near the Project site and enjoy the natural environment of La Paz County and the surrounding desert areas. LIUNA 1184 members enjoy the natural beauty of the area through camping, hiking, and hunting and enjoy its peaceful repose and diversity and rarity of species of plants and animals. LIUNA 1184 members who recreate, walk, view wildlife and plant life, reside, and otherwise use and enjoy the natural resources of the public lands will be negatively affected by the Project's adverse environmental impacts, including but not limited to impacts to rare and sensitive species like the Sonoran Desert Tortoise and the LeConte's thrasher. Plaintiff and its members have been involved in the administrative proceedings that have been

provided to date for the Project, including providing extensive written comments and an expert wildlife report. Plaintiff's members' environmental, aesthetic, recreational, scenic, scientific, informational, and community interests will, unless the relief requested herein is granted, be adversely affected and injured by Defendants' failure to comply with NEPA in approving the Project. Plaintiff brings this action on behalf of its members and the public interest.

11. Plaintiff exhausted all of the administrative remedies available from the Defendants. Plaintiff participated in the administrative process conducted for the Project's environmental assessment by submitting written comments to the BLM on the Project's draft and final EIS. Plaintiff's or others' comments during the BLM's environmental review process raised each of the claims alleged in this complaint.

12. Plaintiff attempted to persuade Defendants that their environmental review did not comply with the requirements of NEPA, to no avail. Plaintiff has no plain, speedy, or adequate remedy in the ordinary course of law, in that Defendants' approval of the Project and associated FEIS is not otherwise reviewable in a manner that provides an adequate remedy to cure Defendants' violations of NEPA. Accordingly, Plaintiff seeks an order of this Court rectifying Defendants' violations of NEPA.

**B.     Defendants.**

13. Defendant UNITED STATES DEPARTMENT OF THE INTERIOR is an executive federal department that approved the BLM's decision to issue a right-of-way grant to Jove Solar, LLC to construct, operate, maintain, and decommission the Jove Solar Project on public lands.

14. Defendant the BUREAU OF LAND MANAGEMENT is a federal agency that awarded the right-of-way grant to Jove Solar, LCC to construct, operate, maintain, and decommission the Project. The BLM served as the lead agency for the Project and preparation of the EIS.

15. Defendant WILLIAM MACK is the District Manager for the BLM's Colorado River District and was the BLM official who approved the Project. District Manager MACK is sued in his official capacity. On January 3, 2025, District Manager MACK signed the ROD approving the EIS and the Project.

16. Defendant STEVEN FELDGUS is the Principal Deputy Assistant Secretary of Land and Minerals Management for the Department of the Interior and was the final official who issued the ROD for the Project. Principal Deputy Assistant Secretary FELDGUS is sued in his official capacity. On January 3, 2025, Principal Deputy Assistant Secretary FELDGUS signed the ROD approving the Project.

17. Defendant JOVE SOLAR, LLC is the applicant for the Project and the grantee of the right-of-way approved in the ROD. JOVE SOLAR, LLC is a Delaware limited liability company.

## LEGAL BACKGROUND

## THE NATIONAL ENVIRONMENTAL POLICY ACT

18. "NEPA … makes environmental protection a part of the mandate of every federal agency and department," *Calvert Cliffs' Coord. Com. v. United States*, 440 F.2d 1109, 112 (D.C. Cir. 1971), and is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). Its purpose is "to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." *Id*. § 1500.1(c). The Council on Environmental Quality ("CEQ"), an agency within the Executive Office of the President, has promulgated regulations implementing NEPA that have been adopted by the Department of the Interior. *See* 43 C.F.R. § 46.10 *et seq*.

19. NEPA's two purposes are to ensure that federal agencies undertaking a major federal action take a hard look at the proposed project's environmental impacts before deciding how to proceed, and to ensure that relevant information about the impacts of a proposed project and its alternatives is made available to members of the public, in order to provide the public with a meaningful opportunity for comment and participation in the federal decision-making process.

20. Among other things, NEPA requires all agencies of the federal government to prepare a "detailed statement" that discusses the environmental effects of, and reasonable alternatives to, all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This statement is commonly known as an environmental impact statement ("EIS"). An EIS must describe: (1) the "environmental impact of the proposed action"; (2) any "adverse

environmental effects which cannot be avoided should the proposal be implemented"; and (3) any "alternatives to the proposed action." *Id*.

21. Agencies must ensure the professional integrity, including scientific integrity, of the discussion and analysis in an EIS. 40 C.F.R. § 1500.1(b). NEPA requires that an EIS provide high quality information and accurate scientific analysis. *350 Montana v. Haaland*, 50 F.4th 1254, 1272 (9th Cir. 2022). "Accurate scientific analysis is essential to implementing NEPA." *Oregon Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 568 (9th Cir. 2016) [citation omitted].)

22. "Establishing appropriate baseline conditions is critical to any NEPA analysis" because "'[w]ithout establishing the baseline conditions which exist . . . before [a project] begins, there is simply no way to determine what effect the [project] will have on the environment and, consequently, no way to comply with NEPA." *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016) (*quoting Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988)). Agencies have a "duty to assess, in some reasonable way, the actual baseline conditions at the [project] site." *Oregon Nat. Desert Ass'n*, 840 F.3d at 569.

23. The evaluation of mitigation measures is also an essential component of an EIS. An EIS must discuss mitigation measures with "sufficient detail to ensure that environmental consequences have been fairly evaluated." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989). "That requirement is implicit in NEPA's demand that an EIS discuss 'any adverse environmental effects which cannot be avoided . . .'" *Okanogan Highlands Alliance v. Williams*, 236 F.3d 468, 437 (9th Cir. 2000) (citing 42 U.S.C § 2332(C)(ii)). Furthermore, a "perfunctory description" of mitigation measures does not adequately satisfy the "hard look" requirement. *Id.*

## PROCEDURAL BACKGROUND

24. In April 2022, Jove Solar LCC applied for a 30-year right-of-way grant to construct, operate, maintain, and decommission the Jove Solar Project. The Project had been previously referred to as the Orion and Taurus Solar projects.

25. On December 7, 2022, the BLM published a Notice of Intent to prepare an EIS for the Project in the *Federal Register*, initiating a 30-day public scoping period. The BLM conducted an in-

person scoping meeting on January 11, 2023 at Tonopah Valley High School in Tonopah, Arizona. On January 17, 2023, the BLM conducted a virtual scoping meeting. The BLM received 19 letters and emails, with 145 individual comments. Several issues were raised including concerns about biological resources such as impacts to wildlife habitat and special-status or sensitive species like the Sonoran Desert Tortoise. The scoping period ended on February 1, 2023.

26. On April 19, 2024, the BLM published a Notice of Availability of the draft EIS for the Project in the *Federal Register* initiating a 45-day public comment period. The notice identified the wash avoidance alternative as the BLM's preferred alternative, which would avoid construction within a desert wash that crosses the project site. On May 14, 2024, the BLM held a virtual public meeting on the draft EIS. On June 10, 2024, LIUNA 1184 submitted written comments on the draft EIS. The BLM received twenty-six comments in total, including from federal and state agencies.

27. On November 15, 2024, the BLM published a Notice of Availability of the final EIS for the Project in the *Federal Register*. On December 16, 2024, LIUNA 1184 submitted written comments on the final EIS.

28. On January 3, 2025, BLM District Manager Mack and DOI Principal Deputy Assistant Secretary Feldgus signed the Record of Decision approving the Project as described in the wash avoidance alternative.  On January 7, 2025, the BLM made the ROD available to the public.

**FACTUAL BACKGROUND**

**The Project .**

29. The Project is a solar facility located in southeastern La Paz County, Arizona, approximately 85 miles west of Phoenix, 30 miles west of Tonopah, and 1.5 miles south of Interstate 10.  The Project will encompass 3,495 acres of BLM-administered public lands and 38 acres administered by La Paz County.

30. The Project would generate 600 megawatts (MW), connect to the Ten West Link 500 kilovolt (kV) transmission line via a proposed generation transmission line.  The Project would include the following:

- Up to 1.2 million PV modules; direct current cabling and combining switchgear, above ground electrical connection lines, and temporary laydown areas;
- 120 power conversion stations, voltage collection systems, transformers, a substation, and monitoring and control systems;
- A single- or double-wide premanufactured operation and maintenance facility; and
- Generation transmission line: overhead 69 kV connection lines would extend from a new project substation for approximately 1.7 miles within a utility easement crossing La Paz County and state land to the Cielo Azul switching station.

**The Sonoran Desert Tortoise.**

31. The Sonoran Desert tortoise is a BLM-sensitive species. The tortoise occurs in desert mountains, rocky areas, washes cut through caliche, and bajadas in desert scrub vegetation communities. The greatest threats to the tortoise are habitat fragmentation and conversion caused by development, human-tortoise interactions such as vehicle strikes, wildfires, invasive plant species, and climate change.

32. The tortoise is protected by the state of Arizona where since 1988, it has been illegal to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect the species.

33. In an effort to promote interagency coordination to conserve the tortoise, in 1995, several federal and state agencies, including the BLM, Arizona Fish and Game Department, National Park Service, U.S. Fish and Wildlife Service, among others, created the Arizona Interagency Desert Tortoise Team ("AIDTT"). In 1996, the AIDTT issued a management plan for the species and standard guidelines for project mitigation measures. In 2008, those mitigation measures were updated in the *Recommended Standard Mitigation Measures for Projects in Sonoran Desert Tortoise Habitat*.

34. In a 2021 species assessment, the U.S. Fish and Wildlife Service ("USFWS") identified primary threats to the tortoise which include habitat conversion to human developed landscapes, habitat fragmentation, and human-tortoise interactions such as handling and vehicle strikes. Habitat conversion impacts can result in either "immediate fatalities of individuals during construction or delayed fatalities from starvation, exposure, or predation should an individual survive the

construction phase and/or be displaced from its home range." Large scale habitat conversion "causes significant changes or removes habitat altogether, removing high potential habitat areas and making regional and landscape movements by Sonoran [D]esert tortoises challenging, if not impossible." Habitat fragmentation, which is primarily caused by transportation infrastructure (i.e. roads), may result in vehicle strikes. Habitat fragmentation may also restrict movement preventing tortoises from finding preferred plant forage species or different shelter sites.

35. The 2008 recommended mitigation measures explain that "if tortoises have been found in the project area or nearby areas of similar habitat, the species can be presumed present and appropriate mitigation measures must be included in the proposed project." The mitigation guidance document provides a list of potential mitigation measures to consider, acknowledging that mitigation measures should be tailored to the specific project. The document notes that an "appropriate mitigation plan will require the input of a desert tortoise biologist and authorizing agencies."

**The FEIS's Discussion of Biological Baseline Conditions.**

36. Aztec Engineering Group, Inc. ("Aztec"), an engineering and environmental consulting firm, prepared a Biological Resources Technical Report for the Project ("Aztec Report").

37. The Aztec Report indicates that on February 15 through February 17, 2022, two biologists from Aztec conducted a field site visit "to identify vegetation communities, assess habitat conditions, inventory plant species, record observations of wildlife including special status species, and identify suitable habitat or components of suitable habitat for special status species in the project area." The Aztec Report also provided that "[n]o protocol surveys for wildlife or plants were conducted during the field site visit and a comprehensive survey of the entire [P]roject was not conducted."

38. Based on the February 2022 field site visit, Aztec concluded that no desert tortoise shelter sites were identified in drainages within the project area. Aztec also asserted that "[t]he remaining portions of the project area consist of desert flats and do not provide burrowing or sheltering opportunities for desert tortoise." Aztec did acknowledge that the project area "may serve as dispersal habitat between mountain ranges." The FEIS, citing Aztec, concludes that "Desert tortoises may

occur within the project area, but sheltering habitat is not present and suitable burrows have not been observed within the project (AZTEC Engineering 2023a)." FEIS, 3-38.

39. The only focused transect surveys conducted by Aztec for the Project were outside of the Project site. On February 17, 2022, Aztec surveyed two separate areas outside of the Project area. Survey Area 1 contained potentially suitable habitat in the form of rocky outcrops that exhibit caves and crevices that may provide suitable shelter sites for Sonoran desert tortoise. Survey Area 2 did not contain any suitable shelter sites as the surveyed area consisted of primarily desert pavement with little to no rocky outcroppings. Aztec provided two photos of the desert pavement in Survey Area 2. No tortoises or tortoise sign were observed within these two areas. The FEIS does not rely on any transect surveys for Sonoran desert tortoise conducted on the Project site.

40. The two photos of desert pavement in Survey Area 2 were the only reference to the conclusion in the FEIS that the Project site had desert pavement scattered throughout.

41. Plaintiff's expert wildlife ecologist, Dr. Shawn Smallwood, Ph.D., reviewed Aztec's Report and found that it "insinuated a thoroughness that was not achieved" and that Aztec's conclusions "did not comport with the level of survey effort nor the facts of what had been observed at the site." Dr. Smallwood noted that "[t]here was no chance that a project area of 3,533 acres could have been sufficiently surveyed in only two days."

42. Dr. Smallwood and his associate Noriko Smallwood visited the Project site on May 18 and May 19, 2024. Dr. Smallwood and Noriko Smallwood surveyed the site for nearly ten hours.

43. The Smallwoods found that "[m]ost of the site is covered by grasses, flowering plants, shrubs, cacti, and trees." The following photo was taken by Dr. Smallwood and is typical of vegetation he observed on the Project site.



44. During the Smallwoods' site visit, they found and captured photographs of multiple Sonoran Desert tortoise burrows, indicating the species' presence on the Project site. Based on the number of Sonoran Desert tortoise burrows on the site, Dr. Smallwood estimates that 78 tortoises occur on the site and that this numerical capacity of the tortoise would be lost as a result of the Project. Dr. Smallwood's findings were submitted with Plaintiff's written comments on the DEIS.

45. The following photo of a Sonoran Desert Tortoise burrow on the Project site was taken by Noriko Smallwood on May 19, 2024:



46. In its response to comments, the BLM refused to engage with Dr. Smallwood's expert findings, instead stating that the Aztec report "was conducted in accordance with the BLM's direction, subsequently reviewed by the BLM, and considered sufficient to inform the impact analysis." FEIS at p. E-18. In disregarding expert findings about the presence of the Sonoran Desert

tortoise on the Project site, the BLM failed to adequately analyze the baseline conditions of the Project site and respond to Plaintiff's and its experts' comments on the DEIS.

47. The FEIS relies on the Aztec Report to minimize the potential for impacts to the Sonoran Desert Tortoise. For example, based on the Aztec Report, the FEIS rejects comments that the Project will have significant adverse effects on the connectivity of Sonoran Desert Tortoise habitat because of Aztec's assertion that the Jove Solar Project "is unlikely to support resident Sonoran Desert tortoises." FEIS, p. E-13. Based on the Aztec Report, in mentioning habitat loss and fragmentation resulting from the Project, the FEIS only concludes that, although the Project will remove 3,533 acres of habitat, vis a vis the Sonoran Desert Tortoise, it is only a possibility and limited to possibly removing only dispersal habitat – "[t]he Project *may* remove up to 3,553 acres of dispersal habitat for Sonoran Desert tortoise." FEIR, p. 3-38. *See also id.*, p. 3-29. The conclusion that the Project site has no resident tortoises or suitable burrowing or sheltering sites also indirectly diminishes the extent of the Project's effect from human disturbances on the tortoise including vehicle collisions, fencing, increased predation, illegal collection, and human-caused wildfires.

48. The FEIS' discussion of mitigation measures does not rectify the inadequacies of the baseline assessment for Sonoran Desert tortoises or obviate the need for the EIS to discuss the potential impacts to the Tortoise. The only wildlife mitigations identified by the FEIS is the application of the Project's design features and compliance with the "2008 Recommended Standard Mitigation Measures for the Sonoran Desert Tortoise." FEIS, p. 3-41. None of the Design Features listed in Table B-1 of Appendix B of Appendix C to the FEIS provide an accurate baseline of Sonoran Desert Tortoises or their habitat at the Project. Post-approval and pre-construction surveys do not address or reduce any impacts of lost Desert Tortoise habitat resulting from the Project. The documentation and disposal of carcasses from vehicle collisions will not prevent such collisions or reduce the numbers of stricken Tortoise's. An admonition to minimize habitat loss does not reduce the size of the Project and the 3,553 acres of wildlife habitat the Project will disturb.

49. The 2008 Recommended Standard Mitigation Measures for the Sonoran Desert Tortoise only lays out a procedure for establishing a mitigation plan for a project and only lists potential

measures that could be applied to a project. Future compliance with the procedure does not identify any specific recommended measures that would be applied to the Project. Nor does the existence of the 2008 document or its future consideration serve to bolster the FEIS's baseline information for the Sonoran Desert Tortoise and its habitat at the Project site.

**The FEIS Failed to Justify the Geographic Scope of the Project's Cumulative Effects Analysis.**

50. The DEIS provided that the cumulative effects analysis area for the Project was a 10-mile radius. DEIS at p. 3-19. The DEIS did not justify this geographic scope chosen for the cumulative effects analysis, nor did the BLM attempt to justify it in its response to comments in the FEIS.

51. Dr. Smallwood and other commenters, including the Arizona Fish and Game Department ("AZFGD") raised concerns about the geographic scope of the Project's cumulative effects analysis. AZFGD commented that "[t]he cumulative impacts analysis only includes projects within 10 miles of the proposed project, but the cumulative effects determination is based on the nearly 20 million acres of these habitat types in Arizona. The analysis and effects determination need to be based on the same scale. The Department requests that the cumulative effects section be revised to use the same scale for the analysis and effects determination." FEIS at p. E-8. Instead of directly responding to these concerns and providing a justification for the geographic scope chosen, the BLM provided a vague and generic response that it "evaluates the combined effects of other projects, including those proposed or planned but not yet built, on resources in the [D]EIS." FEIS, at p. E-8.

52. Dr. Smallwood commented that a 10-mile radius "is much too short for a desert environment" and that "[p]er each species that occurs across multiple types of environment, home ranges tend to be much larger where they occur in desert environments." The BLM reiterated its previous response to AZFGD, adding that "[t]he cumulative effects analysis area is appropriate for the scale of the BLM decision to be made." FEIS at p. E-19.

53. The BLM's failure to justify the geographic scope chosen for the Project's cumulative effects area renders the Project's cumulative effects analysis incomplete and inadequate. Furthermore, the BLM failed to adequately respond to comments when it disregarded legitimate

issues raised by AZFGD and Dr. Smallwood about the geographic scope of the project not being large enough to support BLM's conclusions on the Project's cumulative effects.

**CLAIM FOR RELIEF**
**(Violation of NEPA and APA)**

54. Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

55. The FEIS prepared by the BLM for the Project is arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law for the following reasons:

    a. The FEIS fails to adequately assess baseline conditions for the project area, in particular existing conditions regarding the Sonoran Desert tortoise. The BLM arbitrarily relied on inadequate biological surveys that underestimate the prevalence of the species on the Project site while ignoring expert evidence to the contrary. The BLM's assertions in the FEIS that impacts to the Sonoran Desert tortoise would be avoided, minimized, or otherwise addressed by project design features are unreasonable and not supported by the record because the biological report the BLM relies on underestimates the occurrence likelihood of the species on the site.

    b. The FEIS fails to adequately analyze the cumulative effects the Project will have on biological resources. The FEIS fails to justify the geographic scope of Project's cumulative effects analysis despite comments from the Arizona Fish and Game Department and Plaintiff's expert raising issues about the scope being too restrictive.

    c. The FEIS fails to respond adequately or at all to Plaintiff's and its experts' comments on the DEIS, including but not limited to each of the issues identified in this paragraph.

56. The BLM's failure to prepare an adequate FEIS violated and is continuing to violate Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C).

57. The BLM's failure to prepare an adequate FEIS and issuance of the ROD in reliance on the deficient FEIS is arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2), and should therefore be declared unlawful and set aside by this Court.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

1. Issue a declaratory judgment that the FEIS prepared by the BLM in connection with its decision to approve the Project violated and is violating NEPA and the Administrative Procedure Act;

2. Issue an order vacating, in whole or in part, the FEIS and the ROD;

3. Order the Defendants to prepare, circulate and consider an EIS consistent with the requirements of NEPA.

4. Preliminarily and permanently enjoin Defendants from initiating any activities in furtherance of the Project that could result in any change or alteration to the physical environment unless and until Defendants BLM and DOI prepare an EIS that complies with the requirements of NEPA and reconsider the awarding of the right-of-way grant to Jove Solar LLC.

5. Award Plaintiff its reasonable attorneys' fees and its costs, expenses and disbursements associated with this action pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.*, and all other applicable authorities.

6. Grant Plaintiff such additional and further relief as the Court may deem just and proper.

DATED: March 3, 2025

Respectfully submitted,

s/ *Michael R. Lozeau*
Michael R. Lozeau
LOZEAU DRURY LLP
Attorneys for Plaintiff